# EXHIBIT A

| DISTRICT COURT, DENVER COUNTY, STATE OF COLORADO<br>1437 Bannock Street<br>Denver, CO 80202<br>Telephone: (303) 606-2300 | DATE FILED: October 24, 2022 4:48 PM<br>FILING ID: 7681223F6C787<br>CASE NUMBER: 2022CV33069 |
|---|---|
| **Plaintiffs:**<br><br>CAYO, INC. D/B/A HUKLBERRY, a Nevada Corporation.<br><br>v.<br><br>**Defendants:**<br><br>SWISS REINSURANCE AMERICA CORPORATION, a New York Corporation; LUMICO LIFE INSURANCE COMPANY, a Missouri Corporation; and IPTIQ AMERICAS, INC., a Delaware Corporation | ▲ COURT USE ONLY ▲ |
| *Attorneys for Plaintiffs:*<br>Mark G. Lukehart, #27387<br>GSL Trial Lawyers<br>650 S. Cherry Street, Suite 825<br>Glendale, Colorado 80246<br>Phone: (303) 800-1706<br>E-mail: mlukehart@gsltrial.com | Case Number:<br><br><br>Div.:      Ctrm: |
| **COMPLAINT AND DEMAND FOR JURY TRIAL** | |

**COMES NOW** the Plaintiff, Cayo, Inc. d/b/a Huklberry, through counsel, and hereby submits this Complaint and Demand for Jury Trial against Defendants Swiss Reinsurance America Corporation, Lumico Life Insurance Company, and iptiQ Americas, Inc. (collectively "Defendants") and states as follows:

## PARTIES

1. Plaintiff Cayo, Inc. d/b/a Huklberry ("Huklberry") is incorporated under the laws of the State of Nevada with its principal place of business in the State of Nevada. Huklberry is authorized to transact and does transact business in the State of Colorado.

2. Defendant Swiss Reinsurance America Corporation ("Swiss Re") is incorporated under the laws of the State of New York with its principal place of business in the State of New York. On information and belief, Swiss Re is authorized to transact and does transact business in the State of Colorado.

3. Defendant Lumico Life Insurance Company ("Lumico") is incorporated under the laws of the State of Missouri with its principal place of business in the State of New York. On information and belief, Lumico is authorized to transact and does transact business in the State of Colorado.

4. Defendant iptiQ Americas, Inc. ("iptiQ") is incorporated under the laws of the State of Delaware with its principal place of business in the State of New York. On information and belief, iptiQ is authorized to transact and does transact business in the State of Colorado.

## JURISDICTION AND VENUE

5. The District Court, City and County of Denver, has subject matter over this action pursuant to Article VI, section 9 of the Colorado constitution, which provides that district courts shall have original jurisdiction in all civil cases.

6. The District Court, City and County of Denver, has personal jurisdiction over Defendants pursuant to C.R.S. § 13-1-124(1) and (2) because they have transacted business within the state of Colorado in connection with the claims alleged herein and because certain of the conduct underlying those claims occurred in Colorado.

7. Venue is proper in this Court, pursuant to C.R.C.P. 98, because all of the corporate Defendants are non-residents of the State of Colorado and because some or all of the tortious acts complained of occurred within Denver County.

## GENERAL ALLEGATIONS

### The "Instant Issue" Insurance Market

8. Historically, sales of life insurance policies depended upon costly face-to-face meetings between brokers and potential clients.

9. In 2016, Huklberry, an insurance-industry pioneer, developed the "Instalife" platform (the "Platform"), which was one of the first web-based "instant-issue" life insurance platforms in the country.

10. Huklberry's Platform provided a safe and secure way for partnering insurance companies to provide life insurance policies directly to qualified applicants with competitively-priced premiums that could be approved instantly online.

11. The Platform's direct-to-consumer design thus eliminated the significant costs of insurance sales representatives and external underwriting services.

12. In addition, applicants who used Huklberry's online Platform but did not instantly qualify for coverage would then be contacted by a call center, where the applicants could potentially be approved over the phone.

13. This was a major advantage to Huklberry's Platform because such applicants would be more likely to obtain a life insurance policy when compared to a cold call to a potential client.

14. Huklberry's Platform generated additional revenue by cross-selling applicants who provided their information through the online application process.

15. Because of Huklberry's long-standing experience in the insurance industry and with online lead generation, it had the capability to obtain sales licensing in all 50 states.

16. Given its early success and these advantages in the instant-issue insurance market, Huklberry was uniquely positioned as a market leader with high scalability potential.

**The Joint Venture Agreement**

17. In March 2017, Crump Life Insurance Services, Inc. ("Crump"), a third-party insurance broker, approached Huklberry and indicated that Swiss Re, a global insurance provider with offices in 80 countries, had expressed interest in discussing a potential joint venture between Huklberry and Swiss Re's United States insurance subsidiary, Lumico.

18. On March 4, 2017, Swiss Re, Lumico and iptiQ made a presentation to Huklberry in Denver Colorado143, proposing that Huklberry become the exclusive marketer and seller of Lumico's new instant-issue product using the Huklberry Platform.

19. During the March 4 presentation, Swiss Re made written and verbal representations that it expected a 60-90% "conversion rate" of the Lumico instant-issue policies for qualified applicants who were generated through Huklberry's Platform.

20. The conversion rate is one of the key drivers of Huklberry's business model and is simply the number of applicants generated by the Huklberry Platform who are ultimately issued a life insurance policy divided by the total number of applicants who completed an entire application through Huklberry's Platform.

21. Relying on Swiss Re's written and verbal representations, Huklberry agreed to enter into a joint venture to use the Huklberry platform as the exclusive online marketer for Lumico's instant-issue policies.

22. Pursuant to that agreement, Huklberry was responsible for continuing to optimize the "front end" of its existing Huklberry Platform, which included web-based marketing and lead generation.

23. Swiss Re, on the other hand, was responsible for developing the "back end" of the Huklberry Platform, which included the ability to approve Swiss Re's instant-issue policies via an automated underwriting process.

24. To spearhead this effort, Swiss Re turned to its technology subsidiary, iptiQ, which develops digital insurance platforms and automated insurance underwriting processes.

25. For its part, Crump would operate a 24/7 call center to follow up with the estimated 10-30% of potential clients who either wanted to speak to a live agent or who did not automatically qualify for an instant-issue policy, which then required a traditional agent-facilitated underwriting process.

26. The parties further agreed that Huklberry would be provided the first year of premiums for each policy and that Lumico would retain the remainder of the premiums.

27. Huklberry and Crump further agreed that for any policy that was underwritten after it was routed to Crump's call center, Crump would be entitled to 40% of the first-year's premium with Huklberry retaining the remaining 60%.

**The Joint Venture In Action**

28. Pursuant to the joint venture agreement, Huklberry invested $3.8 million to modify and optimize the front end of its Platform and had been reassured by Swiss Re that it would likewise devote significant resources to optimize the back end.

29. In January 2018 Huklberry launched huklberry.com and began offering Lumico's instant-issue policies nationwide exclusively through its Platform.

5

30. To facilitate Swiss Re's development of its portion of the back end of the Platform, iptiQ requested access to all of Huklberry's intellectual property, which Huklberry provided throughout the duration of the joint venture.

31. Huklberry continued to invest in the Platform, employing as many as 12 developers to optimize the Platform's front end.

32. Unfortunately, iptiQ was unable to improve and optimize the back end of Huklberry's Platform, and Lumico was only able to convert 1-2% of the instant-issue applicants generated by the Huklberry Platform, which is far fewer than the 60-90% expectation it had represented in the March 2017 meeting.

33. Nonetheless, by October 2019, the joint venture was still able to obtain an overall conversion rate of 7% - 1.5% by instant-issue and 5.5% through Crump's call center.

34. Because of efficiencies gained as a result of Huklberry's optimization of the front end of the Platform, Huklberry was able to remain financially stable and projected a gross profit of $3,458,831 by the end of 2019, provided that iptiQ would continue to improve the Platform's back end.

**Swiss Re Terminates The Joint Venture**

35. Between the joint venture's inception and October 2019, Huklberry was spending an average of $80,000 per month for marketing efforts and lead generation.

36. Despite falling far short of its represented conversion rate of 60-90%, Swiss Re arranged a conference with Crump and Huklberry in September 2019 and demanded that Huklberry increase its marketing investment to $250,000 per month.

37. Crump and Huklberry both objected to Swiss Re's mandate because Swiss Re had failed to fully optimize the Platform's back end and would therefore be unable to underwrite enough applications to justify such an investment.

38. On October 25, 2019, Swiss Re's legal counsel sent Huklberry a termination letter and a "Termination and General Release" that it requested Huklberry execute.

39. Huklberry did not agree to or sign Swiss Re's draft "Termination and General Release" agreement.

**Swiss Re Steals Huklberry's Intellectual Property**

40. Huklberry later learned that Swiss Re intended to use Huklberry's Platform and market it to other insurance companies, offering them a platform that could be branded under that company's name.

41. As of the filing of this Complaint, iptiQ's own website (iptiQ.com) shows that it provides a very similar platform for the issuance of digital life insurance products "which can be marketed and sold under a partner's own brand."

42. Upon information and belief, Swiss Re demanded the unreasonable increase in Huklberry's monthly marketing spend and subsequently terminated the joint venture with Huklberry as a pretext to use Huklberry's Platform for its own use.

43. Upon information and belief, Swiss Re has rebranded or modified the Huklberry Platform to meet the needs of its customers.

**FIRST CLAIM FOR RELIEF**
(Breach of Fiduciary Duty against all Defendants)

44. Plaintiff incorporates by reference paragraphs 1 through 43 above as though fully set forth herein.

45. The parties agreed to enter into a joint venture in 2017.

46. The parties had a joint interest in optimizing the Huklberry Platform pursuant to their agreement that Huklberry would be the exclusive marketer and seller for Lumico's instant-issue product.

47. The parties agreed to share in the profits and losses during the operation of the joint venture.

48. Between its inception in 2017 and the termination of the joint venture in October 2019, the parties cooperated with each other to further the interests of the joint venture.

49. As joint venturers, the parties owe each other reciprocal fiduciary duties, including the duties of loyalty and utmost good faith.

50. Defendants breached these fiduciary duties by, *inter alia*, (a) misrepresenting the expected conversion rate; (b) failing to invest adequate resources to optimize the Platform; (c) terminating the joint venture pretextually, (d) misappropriating the intellectual property developed and maintained by Huklberry without its permission; and (e) using Huklberry's intellectual property for their own benefit without Hukleberry's permission after the joint venture ended.

51. Plaintiff performed all of its obligations under the joint venture.

52. Plaintiff suffered damages as a result of Defendants' breaches of their fiduciary duties in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
(Breach of Implied Contract against All Defendants)

53. Plaintiff incorporates by reference paragraphs 1 through 43 of their claims above as though fully set forth herein.

54. Through their conduct, the parties evidenced a mutual intention to enter into a contract.

55. An implied contract thus arose based on that conduct.

56. Defendants breached that implied contract by, *inter alia*, (a) misrepresenting the expected conversion rate; (b) failing to invest adequate resources to optimize the Platform; (c) terminating the joint venture pretextually, (d) misappropriating the intellectual property developed and maintained by Huklberry without its permission; and (e) using Huklberry's intellectual property for their own benefit without Hukleberry's permission after the joint venture ended

57. Plaintiff performed all of its obligations pursuant to that implied contract.

58. Plaintiff suffered damages as a result of Defendants' breaches of the implied contract in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
(Promissory Estoppel (in the alternative) against All Defendants)

59. Plaintiff incorporates by reference paragraphs 1 through 43 of their claims above as though fully set forth herein.

60. Defendants made the following promises to Plaintiff, among others: (1) they expected a 60-90% "conversion rate" of the Lumico instant-issue policies for qualified applicants who were generated through Huklberry's Platform; (2) they would commit adequate resources to develop the "back-end" of the Platform in an effort to hit that conversion rate; (3) they would work collaboratively with Plaintiff to develop and optimize the Platform.

61. Plaintiff reasonably relied on Defendants' promises to its own detriment.

62. Defendants reasonably should have expected that their promises would induce Plaintiff to commit significant resources to optimizing the "front end" of the Huklberry Platform.

63. Thus, even if no contract existed between the parties, Defendants' promises must be enforced to prevent injustice under the doctrine of promissory estoppel.

64. Plaintiff suffered damages as a result of Defendants' failure to abide their promises in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
(Violation of Colorado's Uniform Trade Secrets Act (C.R.S. 7-74-101 *et. seq*.) against All Defendants)

65. Plaintiff incorporates by reference paragraphs 1 through 43 of their claims above as though fully set forth herein.

66. During the course of the joint venture, Defendants were provided access to Huklberry's confidential and proprietary intellectual property, including the coding, design and processes used by Huklberry in developing and optimizing its market-leading Platform.

67. During the courts of the joint venture, Huklberry invested more than $3.6 million to continue developing and optimizing its Platform.

68. Huklberry took steps to conceal its intellectual property from persons and entities other than Defendants.

69. Because no other similar platform existed prior to March 2017 when Swiss Re approached Huklberry about entering into the joint venture, it would have cost a competitor significant time and expense to create a similar platform.

70. Huklberry's intellectual property was a "trade secret" as that term is defined in C.R.S. 7-74-102(4).

71. After the joint venture ended, Defendants "misappropriated" Huklberry's trade secrets by "improper means," as those terms are defined in C.R.S. 7-74-102.

72. Defendants knew, or should have known, that they had acquired Huklberry's trade secrets improperly and without Huklberry's permission.

73. Plaintiff has suffered damages as a result of Defendants' misappropriation of Huklberry's trade secrets and is entitled to damages in an amount to be determined at trial pursuant to C.R.S. 7-74-104.

## FIFTH CLAIM FOR RELIEF
(Fraudulent Misrepresentation against All Defendants)

74. Plaintiff incorporates by reference paragraphs 1 through 43 of their counterclaims above as though fully set forth herein.

75. Huklberry chose to enter into the joint venture with Defendants based in large part on Defendants' representation in its March 4, 2017, presentation that a 60-90% conversion rate was to be expected.

76. On information and belief, Defendants knew that their representation of a 60-90% conversion rate during their March 4, 2017, presentation to Huklberry was false.

77. Plaintiff relied on Defendants' misrepresentation of the conversion rate, which was the primary reason that Huklberry decided to enter into the joint venture with Defendants.

78. Plaintiff justifiably relied on Defendants' misrepresentation of the conversion rate, which was a material fact.

79. Plaintiff suffered damages as a result of Defendants' fraudulent misrepresentation in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
(Unjust Enrichment (in the alternative) against All Defendants)

80. Plaintiff incorporates by reference paragraphs 1 through 43 of their claims above as though fully set forth herein.

81. On information and belief, Defendants have continued to use Huklberry's intellectual property to their benefit after the joint venture between the parties ended.

82. Defendants' continued use of Huklberry's intellectual property came at Huklberry's expense.

83. Under the circumstances, it would be unjust for Defendants to retain that benefit without adequate compensation to Huklberry.

## PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, Plaintiff Cayo, Inc. d/b/a Huklberry respectfully requests that this Court enter judgment in its favor against Defendants and grant the following relief:

1. Compensatory damages on each of Plaintiff's claims;

2. Exemplary damages pursuant to C.R.S. 7-74-104(2);

3. An award of Plaintiff's reasonable costs and attorneys' fees;

4. Enjoining defendants from any further use of Huklberry's trade secrets or intellectual property obtained by Defendants during the joint venture pursuant to C.R.S. 7-74-103;

5. All other such and further relief that this Court may deem just and equitable.

Plaintiffs Cayo, Inc. d/b/a Huklberry hereby request a trial by jury of all claims so triable.

Dated this 24th day of October 2022.

GSL TRIAL LAWYERS

By: */s/ Mark G. Lukehart*
*Attorney for Plaintiffs*